## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MIRIAM ROVNER, individually, and** | : | **Civil No. 1:11-CV-2335** |
| **through her Next Friends,** | : | |
| **NEIL AND NINA ROVNER; and** | : | **(Chief Judge Kane)** |
| | : | |
| **NEIL and NINA ROVNER,** | : | **(Magistrate Judge Carlson)** |
| **Individually,** | : | |
| | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **KEYSTONE HUMAN SERVICES,** | : | |
| **et al.,** | : | |
| | : | |
| **Defendants** | : | |

## REPORT AND RECOMMENDATION

## I.    INTRODUCTION

In the above-captioned action, the Commonwealth of Pennsylvania and three of its individual officials have moved to dismiss a complaint filed by Miriam Rovner and her parents, Neil and Nina Rovner, alleging that the Commonwealth defendants violated the Rehabilitation Act and the Americans with Disabilities Act, as well as 42 U.S.C. § 1983 and Title XIX of the Social Security Act by depriving the plaintiffs of due process in connection with the decision by a third party, Keystone Human Services, to discontinue providing residential and habilitative services to Miriam.

This case comes before us in a curious posture. From its inception the gravamen of this case has been the increasingly acrimonious relationship between the Rovners and Keystone regarding Miriam's care. The complaint reveals that this acrimony grew more heated over time, led Keystone to notify the Rovners that it was unwilling to continue to provide care for Miriam due to the increasingly contentious relationship with the Rovners, and then inspired this lawsuit by the Rovners against Miriam's care-givers.

It is undisputed that the Commonwealth defendants played no active role in any of these events. Thus, the Rovners do not allege that the Commonwealth participated in the unfortunate turn of events between them and Keystone which led Keystone to conclude that it was no longer willing to provide care for Miriam. Instead, the Rovners sought to include the Commonwealth defendants in this litigation simply because, in their view, the Commonwealth failed to create a mechanism for forcing Keystone to continue to care for Miriam long after the complaint reveals that the relationship between the Rovners and this care-giver was irretrievably broken. Thus, according to the plaintiffs the liability of the Commonwealth in this matter stems from its alleged failure to provide the Rovners with a legal cudgel that they could use to force Keystone to do something that it was no longer willing to do, undertake to

provide care for their daughter. It is upon this thin reed that the Commonwealth defendants are drawn into this litigation.

Yet while Keystone's action was plainly the focus of the Rovners' complaint, the Rovners have resolved their claims against Keystone, leaving only the Commonwealth defendants in this lawsuit. The Commonwealth defendants have now moved to dismiss the remaining claims pending against them in this action. The motion to dismiss is fully briefed and ripe for disposition. For the following reasons, it is recommended that the motion be granted and the case closed.

## II.   <u>BACKGROUND</u>

Miriam Rovner is a 30 year-old woman with intellectual disabilities who has a variety of mental health needs. For much of her life, Miriam resided with her parents, Neil and Nina Rovner, who provided for her care. On June 8, 2010, Miriam began residing in a group home for intellectually disabled adults in Harrisburg, Pennsylvania, operated by Keystone Human Services ("Keystone"), a private, non-profit entity. While at Keystone, Miriam received what are known as "waiver services" which are paid for with federal Medicaid funds. The funds are administered by the Pennsylvania Department of Public Welfare in accordance with the Commonwealth's Medicaid plan, and the Department makes payments to providers, such as Keystone, for the provision of waiver services to eligible individuals.

The plaintiffs have alleged that a conflict developed between Miriam's parents and the Keystone personnel regarding Miriam's care, and the second amended complaint suggests that this conflict escalated and intensified throughout Miriam's placement in the home. This conflict apparently reached its apex in the fall of 2011, and in a letter dated November 21, 2011, Keystone wrote to the Rovners to advise them that Keystone would no longer be willing to provide residential services to Miriam after December 20, 2011. As justification for its decision to discontinue furnishing these services, the letter states that "the level of conflict between Keystone and [Mr. and Mrs. Rovner] prevent[ed] us from effectively implementing [Miriam's] individual service plan and the individual service plans for others residing in the home, and [was] preventing others from peacefully living in the home." (Second Am. Compl., Ex. A.)

Keystone's letter inspired the Rovners to commence this federal lawsuit, which they initiated through a complaint filed on December 17, 2011, seeking injunctive relief and a temporary restraining order. (Doc. 1.) On December 19, 2011, the plaintiffs filed an emergency motion for a preliminary injunction and a temporary restraining order, seeking to require Keystone to continue providing residential services to Miriam despite Keystone's stated unwillingness to do so. The matter was thereafter referred to the undersigned for purposes of conducting settlement

negotiations.  Those negotiations proved unsuccessful, but the parties agreed to a status quo order, which provided that Miriam would remain at the Keystone group home pending the outcome of the preliminary injunction hearing.  (Doc. 10.)

On March 21, 2012, a preliminary injunction hearing was held before the Honorable Christopher C. Conner.  Prior to the district court issuing a ruling on the plaintiffs' motion for injunctive relief, on June 10, 2012, the Rovners elected to remove Miriam from Keystone's group home, and return her to their residence where they would oversee her care.  (Second Am. Compl. ¶ 3.)  Approximately one month later, following this change in circumstances, the plaintiffs withdrew their motion for preliminary injunctive relief (Doc. 75.), and filed an amended complaint (Doc. 74.). Defendants Gary D. Alexander, Kevin Friel, John Witt, and the Department of Public Welfare (collectively, the "Commonwealth Defendants") then moved to dismiss the amended complaint on August 9, 2012.  (Doc. 82.)

On August 20, 2012, the plaintiffs moved for an extension of time to respond to the defendants' motions to dismiss (Doc. 83.), which request the Court granted by order dated August 21, 2012.  (Doc. 84.)  The Commonwealth defendants filed a brief in support of their motion to dismiss on September 10, 2012.  (Doc. 85.)  On the same day, the plaintiffs filed a status report to inform the Court that they would be seeking leave to file a second amended complaint in response to certain arguments that the

defendants made in their motions to dismiss. (Doc. 86.) On September 20, 2012, the Court entered a scheduling order, directing the plaintiffs to file a motion for leave to file a second amended complaint (Doc. 88.), and the plaintiffs filed an uncontested motion for leave to file a second amended complaint.

On October 12, 2012, the plaintiffs filed their second amended complaint. (Doc. 95.) In this pleading, the plaintiffs withdrew their claim under 42 U.S.C. § 1983 against Keystone, withdrew the First Amendment claim against all defendants, and added a number of state-law tort claims against Keystone. While the claims were altered in this fashion the gist of this lawsuit remained the same– the Rovners focused on Keystone and claimed that Keystone could not lawfully conclude that it was no longer willing to provide care to Miriam due to the increasingly combative and contentious relationship that had arisen between Keystone and the plaintiffs.

With respect to the Commonwealth defendants, the second amended complaint alleges claims for violations of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and for violations of Titles II and III of the Americans with Disabilities Act of 1990, as amended by the Americans with Disabilities Amendment Act, 42 U.S.C. §§ 12131 et seq. and 12181 et seq. (Second Am. Compl., Counts I and II). In addition, the second amended complaint alleges that the Commonwealth defendants deprived the plaintiffs of federal statutory rights guaranteed under the

6

Fourteenth Amendment of the United States Constitution, and otherwise violated the plaintiffs' right to due process by "allow[ing] [Keystone] to terminate Miriam from her day program on October 14, 2011, and permitt[ing] [Keystone] to pursue termination of her residential program on December 20, 2011, in retaliation for the involvement and advocacy of Miriam's parents, plaintiffs Neil and Nina Rovner." (Second Am. Compl., Count III.) The plaintiffs also allege that the Commonwealth defendants "failed to follow the mandates of the [Title XIX of the Social Security] Act by not providing Medicaid Fair Hearing when providers terminate, deny, discharge or reduce services to an individual with a disability." (Second Am. Compl., Count IV.) In support of this allegation, the plaintiffs aver that the Commonwealth failed to ensure that Miriam's right to a due process hearing was protected after Keystone "terminated her day program at Hope Springs Farm and the subsequent effort to terminate Miriam from her residential program." (Id.) Finally, the plaintiffs allege that the Commonwealth Defendants and Keystone violated Miriam's rights under Pennsylvania state law by "willfully depriving Miriam Rovner of rights or human dignity and causing her physical and emotional harm" and by "[d]enying Miriam Rovner the right to receive scheduled and unscheduled visitors, communicate, associate and meet privately with family and persons of the individual's own choice." (Second Am. Compl., Count V.)

The Commonwealth defendants have moved to dismiss all claims in the second amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that the plaintiffs have failed to state a claim for which relief can be granted under any theory alleged. The motion is fully briefed and has been referred to the undersigned for purposes of preparing a report and recommendation.

## III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated, Hedges v. United States, 404 F.3d 744, 750 (3d Cir.2005), and dismissal is appropriate only if, accepting all of the facts alleged in the complaint as true, the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face," Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007) (abrogating "no set of facts" language found in Conley v. Gibson, 355 U.S. 41, 45–46 (1957) ). The facts alleged must be sufficient to "raise a right to relief above the speculative level." Twombly, 550 U.S. 544, 555. This requirement "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" of necessary elements of the plaintiff's cause of action. Id. at 556. Furthermore, in order to satisfy federal pleading requirements, the plaintiff must "provide the grounds of his entitlement to

relief," which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir.2008) (brackets and quotations marks omitted) (quoting Twombly, 550 U.S. 544, 555).

In considering a motion to dismiss, the court generally relies on the complaint, attached exhibits, and matters of public record. Sands v. McCormick, 502 F.3d 263, 268 (3d Cir.2007). The court may also consider "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents." Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir.1993). Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir.2002); see also U.S. Express Lines, Ltd. v. Higgins, 281 F.3d 383, 388 (3d Cir. 2002) (holding that "[a]lthough a district court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment."). However, the court may not rely on other parts of the record in determining a motion to dismiss. Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir.1994).

# IV.   DISCUSSION

### A.   Plaintiffs Have Not Stated a Claim Based Upon their Allegations that the Commonwealth Defendants Have Violated the Plaintiffs' Right to Due Process or a Fair Hearing Following Keystone's Decision to Discontinue Providing Waiver Services

As we have noted, the gist of the Rovners' complaint from the inception of this action has been that Keystone may not lawfully decide that it is unwilling to provide care to their daughter because of its increasingly combative and contentious relationship with her parents. Thus the Rovners suggest that, once Keystone agreed to provide services, it was estopped from later deciding that it was unwilling to continue those services to Miriam. In essence, the Rovners argue that Keystone's initial volitional choice to provide care transformed into some legally enforceable right on their part to compel services from an unwilling care-giver. From this premise the Rovners insist that the Commonwealth defendants' failure to provide the means to enforce this claim right also makes them liable to the plaintiff.

The difficulty with this proposition is that the right claimed by the Rovners to force an unwilling care-giver to provide services, simply does not clearly exist in the law. Turning to the substance of the plaintiffs' claim that the Commonwealth defendants violated their right to procedural due process by failing to provide the plaintiffs with a fair hearing following Keystone's efforts to discontinue providing

waiver services to Miriam, we find that both that the plaintiffs have failed to state a claim as a legal matter, and also that the facts of this case reveal that the plaintiffs were not entitled to a hearing under applicable regulations.

The pertinent regulations "afford every person applying for or receiving a money payment, medical assistance, food stamps or services the right to appeal from a Departmental action or failure to act and to have a hearing if he is dissatisfied with a decision refusing or discontinuing assistance in whole or in part." 55 Pa. Code § 275.1(a)(2). The state regulations further provide that:

> [T]he opportunity for a hearing will include the right of appeal from the following:
> (A) A denial, suspension or discontinuance in whole or in part.
> (B) A change in the amount of payment.
> (C) A denial, discontinuance, reduction or exclusion from a Departmental service program including the failure to take into account the client's choice of a service . . . .

55 Pa. Code § 275.1(a)(4)(I).

As a threshold matter, the plaintiffs have not articulated how they even come within the reach of these regulations, since the regulations are conditioned on the right to a fair hearing and appeal upon "***Departmental*** action or failure to act." 55 Pa. Code § 275.1(a)(2) (emphasis added). The regulations go on to define the term "departmental" as "agencies which administer or provide social services under

contractual arrangements with the Department." 55 Pa. Code § 275.1(a)(3). The plaintiffs have not alleged facts that could cause Keystone to be considered a "department" under the regulations, and the Commonwealth defendants have affirmatively represented that Keystone does not have a contract with the Department of Public Welfare, but instead provides services to qualified individuals pursuant to a provider agreement that is not signed by the Department. The plaintiffs have not disputed this assertion.

Furthermore, it appears undisputed that Miriam's waiver services ultimately were not denied, discontinued or suspended by Keystone's decision to discharge her from the group home, or its decision that it would no longer be a willing provider of services. Keystone's decision in this regard – which, in fact, never came to pass due to the litigation that ensued and the parties agreement to maintain the status quo during the pendency of this action – did not render Miriam ineligible to receive residential and community-based services. Indeed, it appears beyond dispute that any disruption to Miriam's residential services was ultimately the result of her parents' decision to remove her from the Keystone group home in June 2012, (Second Am. Compl., ¶ 3), before first identifying another willing and qualified provider who could step in an replace Keystone. We do not find, and the plaintiffs have not adequately explained, how the plaintiffs' decision in this regard can reasonably be considered to

be a denial, suspension, or discontinuance that would entitle the plaintiffs to a fair hearing and appeal at that time.

Furthermore, the plaintiffs' claim against the Commonwealth defendants is not saved by the broad, conclusory claim that the Pennsylvania Department of Public Welfare "has a policy and practice of refusing to provide Fair Hearings to beneficiaries who have been discharged from waiver-funded community living arrangements, and has refused to provide a Fair Hearing to Miriam Rovner." (Doc. 119, at 3.) The Commonwealth defendants deny these bald allegations, which are unsupported factually in the pleading, and observe that the plaintiffs have never even requested a fair hearing in response to Keystone's initial notice to discontinue providing waiver services to Miriam, or any anytime thereafter. The plaintiffs have not responded to this assertion, and we find that this further undermines their claim that they were entitled to a fair hearing and appeal in the first instance, as well as the assertion that the Department maintains a policy and practice of refusing to provide fair hearings where required.

Finally we note that the case law that the plaintiffs have cited in support of their due process claims is inapposite and is, in any event, non-binding district court authority from courts outside of the Third Circuit. The cases do not speak to the factual circumstances present in this particular lawsuit, where a third-party provider

notified the plaintiffs that it was no longer willing to provide services to Miriam, but where Miriam remained (and remains) eligible to continue receiving waiver services from other qualified and willing providers.

In this case, it appears that the plaintiffs have consistently held the view that Miriam remained entitled to select her free choice of service providers, even where a service provider notified the plaintiffs that it was no longer willing to provide services. Essentially, the plaintiffs suggest that Keystone was obligated to continue rendering waiver services, indefinitely, because Keystone was, at one time, a willing provider of Miriam's waiver services. The plaintiffs have no legal citation to support this conclusion, which would effectively force providers to remain "willing" to offer services even if they became, in fact, unwilling to do so. Nothing in the applicable statute, regulations, or case law that we have identified supports this assertion.

Under federal law, an individual like Miriam who is entitled to medical assistance "may obtain such assistance from any institution . . . qualified to perform the service or services required . . . who undertakes to provide him such services." 42 U.S.C. § 1396(a)(23). The regulations implementing the law provide requirements for state Medicaid plans, such as the one at issue in this case, and establish that individuals who qualify for services do not have unbridled choice in the service

provider who will ultimately render services. To the contrary, the regulation provides that:

> [A] recipient may obtain Medicaid services from any institution, agency, pharmacy, person, or organization that is –
> (I) *Qualified* to furnish the services; and
> (ii) *Willing* to furnish them to that particular recipient.

42 C.F.R. § 431.51(b)(1) (emphasis added). As the Commonwealth defendants note in their brief, in 1991 amendments to the regulation, the Health Care Financing Administration specifically spoke to these limitations on an individual's right to choose her medical provider, observing that the regulations:

> [A]dded language to counteract a misunderstanding that has arisen in the past: freedom of choice does not obligate a Medicaid provider to furnish services to every recipient. . . . *[A] recipient may seek to obtain services from any qualified provider, but the provider determines whether to furnish services to that particular recipient*.

56 Fed. Reg. 8835 (1991) (emphasis added).

This observation underscores what is evident from the language in the regulation itself: a provider must be both willing <u>and</u> qualified to provide the services to qualified Medicaid recipients, and cannot be compelled to continue providing services to a recipient if, at some point, the provider becomes unwilling to do so. In contrast to what this regulation plainly provides, the plaintiffs suggest that because

Keystone was at one time a willing provider of services, it was thereafter bound to continue providing the services to Miriam even if it later became unwilling to do so. This argument finds no support in the law.

The Commonwealth defendants have cited to multiple decisions standing for the proposition that a Medicaid recipient does not have the legal right to receive services from an unwilling providers. See, e.g., Miller v. Gorski Wladyslaw Estate, 547 F.3d 273, 281 (5th Cir. 2008) ("Even those health care providers that 'do choose to serve patients under Medicaid need not accept all such patients.'") (quoting Barney v. Holzer Clinic, Ltd., 110 F.3d 1207, 1212 (6th Cir. 1997) (citing 42 U.S.C. § 1396a(a)(23), 42 C.F.R. § 431.51(b)(1)); People First of Tennessee v. Clover Bottom Development Center, 753 F. Supp. 2d 701, 711 (M.D. Tenn. 2010) (citing 42 U.S.C. § 1396a(a)(23), 42 C.F.R. § 431.51(b)(1) ("The qualified provider must be willing to furnish services to the recipient."). In addition to this and similar case law, we note that in December 2012, the Pennsylvania Commonwealth Court considered a case in which a recipient alleged, among other things, that the decision of a provider of transportation services to discontinue providing door-to-door transportation service, constituted violations of regulations and the recipient's right due process. In Bussoletti v. Department of Public Welfare, the Commonwealth Court observed that "[w]e are aware of no regulation requiring an unwilling provider to continue offering

16

a service or precluding the modification, reduction or cessation of service" and agreed with an administrative law judge's finding that the provider's decision to discontinue door-to-door service after previously offering such service demonstrated that the provider "was no longer a 'willing' provider of Recipient's door-to-door transportation services." 59 A.3d 682, 687 (Pa. Commw. Ct. 2012).

As the statute, regulations, and foregoing case law indicate, a provider must at all times be both qualified and willing to furnish services to a qualified Medicaid recipient. The plaintiffs have pointed to no legal authority that runs counter to this straightforward reading of the law in this field, and the plaintiffs have not supported their assertion that the Department of Public Welfare could somehow compel Keystone to remain a willing provider of services after Keystone determined that its fractious relationship with the Rovners needed to be terminated following an extended period of growing conflict. We thus do not find that the plaintiffs have articulated a claim based upon the Commonwealth defendants' failure to prevent Keystone from seeking to discharge Miriam from the group home, and we, therefore, recommend that the plaintiffs' claims in Counts III and IV be dismissed.

**B.     Plaintiffs' Claims Under Section 504 of the Rehabilitation Act and Titles II and III of the Americans with Disabilities Act Should Be Dismissed.**

Counts I and II of the second amended complaint allege claims for violations of Section 504 of the Rehabilitation Act of 1973 ("Section 504"), as amended, 29 U.S.C. §§ 794 et seq., and Titles II and III of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12131 et seq. and 12181 et seq., respectively.  As the Commonwealth defendants note, however, all of the pertinent allegations in the second amended complaint relating to these claims involve the Keystone defendants, and acts or omissions on Keystone's part.  We have carefully reviewed the second amended complaint, and are constrained to agree with the Commonwealth defendants that other than the inclusion of an allegation that these claims were brought against all defendants, the second amended complaint is devoid of substantive factual allegations to support the claim that the Commonwealth defendants either denied Miriam the opportunity to participate in or benefit from waiver services, or provided Miriam with aid, benefits, or services that were not equal to or as effective as those afforded to others.

Likewise, the second amended complaint does not include allegations to support the contention that the Commonwealth defendants coerced, intimidated, or

otherwise threatened the plaintiffs.  There simply are no facts in the second amended complaint that could plausibly be construed to extend the plaintiffs' Section 504 and ADA claims to the Commonwealth Defendants, or support the plaintiffs' contention that acts or omissions on the part of the Commonwealth defendants amounted to discrimination or retaliation against Miriam Rovner or her parents based upon Miriam's disability or her parents' advocacy on her behalf.

Aside from this threshold pleading defect, the claims under Section 504 and the ADA simply fail against the Commonwealth defendants.  As the Commonwealth defendants observe, claims under Section 504 and the ADA are interpreted consistently, Emerson v. Thiel College, 296 F.3d 184, 189 (3d Cir. 2002), and the substantive standards for determining liability under the Acts are equivalent, McDonald v. Department of Public Welfare, 62 F.3d 92, 94 (3d Cir. 1995).  See also Doe v. County of Centre, 242 F.3d 437, 446 (3d Cir. 2001) ("[T]he protections found in the ADA and in the Rehabilitation Act are interpreted similarly.").  Section 504 prohibits discrimination against a qualified individual with a disability "solely by reason of her or his disability." 29 U.S.C. § 794(a), and the ADA prohibits discrimination against an individual "on the basis of disability," 42 U.S.C. § 12182. The United States Court of Appeals for the Third Circuit has instructed that the foregoing statutory language means that a plaintiff cannot prevail on claims under

Section 504 "simply by (1) proving that he was denied some service and (2) he is disabled. The state must have failed to provide the service for the sole reason that the child is disabled." Andrew M. v. Delaware County Office of Mental Health and Mental Retardation, 490 F.3d 337, 350 (3d Cir. 2007) (citing Menkowitz v. Pottstown Memorial Med. Ctr., 154 F.3d 113, 124 (3d Cir. 1998)).

Mindful of this standard applicable to the plaintiffs' discrimination claims in this case, we are unable to find any *factual* allegations in the second amended complaint to support the plaintiffs' broad, conclusory contention that the Commonwealth defendants "subject[ed] Miriam Rovner to discrimination on the basis of her disabilities." (Second Am. Compl., ¶ 104(a).) Instead of identifying factual averments and plausible allegations in the pleading to support their claims under Section 504 and the ADA, the plaintiffs' in their brief instead resort to further generality. Thus, the plaintiffs argue that these claims "should remain" because

> the Commonwealth both acted with deliberate indifference by failing to protect Miriam Rovner, a person with a disability from discrimination and retaliation by the Keystone defendants, and acted affirmatively to enable agencies who have undertaken to provide services under the Commonwealth's home and community-based waiver to Miriam and others like her, to discharge those persons upon thirty days' notice for any reason whatsoever.

(Doc. 119, at 4.)

As a threshold matter, this argument is virtually a repackaging of the rhetorical assertions found in the plaintiffs' second amended complaint, unadorned with plausible factual support, or citation to any portion of the second amended complaint that contains averments to support such a claim. Moreover, plaintiffs make no allegations to support the extraordinary charge that the Commonwealth defendants either actively assist or passively endorse decisions by providers to discharge disabled persons from care upon brief notice "for any reason whatsoever."

The plaintiffs' brief makes clear what is also evident from the face of the second amended complaint itself: all of the misconduct alleged in this case is focused on Keystone, not the Commonwealth or its agents. Thus, after outlining allegedly discriminatory or retaliatory conduct on the part of Keystone, the plaintiffs simply assert that "the Commonwealth defendants have aided and perpetuated" that conduct, or have otherwise "fail[ed] to prevent those actions". (Doc. 119, at 12.) The plaintiffs endeavor to bolster these generic allegations by arguing that the Commonwealth has "promulgated a regulation that endorses such actions," allegedly because the regulation permits a third-party provider like Keystone to discharge a disabled individual "for any reason, including retaliation or discrimination because of the severity of a waiver recipient's disability, [and this] also constitutes a criterion or method of administration that has the effect of discriminating against persons with

disabilities." (Doc. 119, at 12.) The plaintiffs do not substantiate this allegation, even by citation to the allegedly offending regulation itself, and we are at a loss as to how the Commonwealth's regulations in this field can now be claimed to be discriminatory with respect to Miriam Rovner and her parents' ultimate decision to remove her on their own volition from the Keystone group home.

Furthermore, we find that the inconsistencies in the plaintiffs' allegations as to the nature of the conflict between the Rovners and Keystone ultimately undermine the Rovners' claims against the Commonwealth defendants. Thus, in addition to making only vague, unsupported, or wholly speculative assertions regarding the Commonwealth defendants' alleged discriminatory conduct, the plaintiffs also seem to be claiming that the real reason for the fractured relationship between Keystone and the Rovners was due to mounting conflict between Keystone personnel and Miriam's parents. Thus, the plaintiffs repeatedly maintain that Keystone ultimately moved to discontinue providing services to Miriam in retaliation for the Rovners' advocacy efforts on behalf of their daughter. (Second Am. Compl., ¶¶ 6, 39, 97.) These allegations strongly suggest that the plaintiffs' claims are based upon alleged retaliation on the part of Keystone, and not on alleged discrimination by the Commonwealth defendants against Miriam and her parents on the basis of Miriam's disability.

But even if the plaintiffs are pursuing a discrimination claim against the Commonwealth defendants, such claim is simply unsupported by sufficient factual allegations that any Commonwealth party actually discriminated against Miriam or her parents because of Miriam's disability. The absence of plausible factual allegations against the Commonwealth defendants with respect to the discrimination charge, coupled with the lack of coherence in the nature of the claims being leveled against the defendants in this case serves to further undermine the plaintiffs' Section 504 and ADA discrimination claims against the Commonwealth defendants.[1]

Aside from these patent defects in their Section 504 and ADA claims against the Commonwealth defendants, we observe that the second amended complaint is virtually silent with respect to any acts or omissions alleged on the part of the individually named Commonwealth defendants, or in how such unidentified acts or omissions constitute either discrimination or retaliation. Indeed, review of the

---

[1] Moreover, the plaintiffs have provided no compelling support for their assertion that the Commonwealth defendants may be liable in this case for the alleged retaliatory conduct by Keystone, or that the Commonwealth defendants were somehow complicit in Keystone's allegedly offending conduct by "aid[ing] and perpetuat[ing]" retaliatory conduct by this provider, or by "fail[ing] to prevent those actions and [the Commonwealth's] active assistance to Keystone in promulgating a regulation that endorses such actions." (Doc. 119, at 12.) The case law cited as support for these arguments found at pages 12 and 13 of the plaintiffs' brief, all of which comes from outside of the Third Circuit, does not speak in any compelling way to the plaintiffs' assertions or claims against the Commonwealth defendants.

pleading reveals that defendants Alexander, Friel, and Witt are not even mentioned in the body of the second amended complaint beyond their initial identification, and the plaintiffs do not include any facts in support of their claim that these individuals either discriminated or retaliated against the Rovners in any fashion. This spare form of pleading is simply inadequate to sustain a claim of personal liability. Hudson v. City of McKeesport, 244 F. App'x 519 (3d Cir. 2007) (affirming dismissal of defendant who was only named in caption of case). Additionally, the Third Circuit has held that individual employees and administrators cannot be liable under Title III of the ADA or Section 504. Emerson v. Thiel College, 296 F.3d 184, 189 (3d Cir. 2002). Thus, these claims are both legally and factually deficient. Accordingly, for the foregoing reasons, we conclude that the plaintiffs' discrimination claims against the Commonwealth defendants brought under Title II and III of the ADA and Section 504 should be dismissed for failure to state a claim.

With respect to the plaintiffs' claims that the Commonwealth defendants retaliated against the plaintiffs, the second amended complaint fares no better. Claims for retaliation in violation of the ADA or Section 504 rely on the same elements. Krouse v. American Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997). In order to state a prima facie case of retaliation under either the ADA or Section 504, a plaintiff must show (1) that he or she was engaged in protected activity; (2) the

alleged retaliator knew the plaintiff was engaging in protected activity; (3) the defendant engaged in adverse action either after or contemporaneously with the protected activity; and (4) there was a causal connection between the protected activity and the adverse action. Id.; see also Lauren W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007). For purposes of this standard, a person has engaged in protected activity where he or she has "'opposed any act or practice made unlawful by' the ADA or Rehabilitation Act" or has "'made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing' under the ADA or Rehabilitation Act." Montanye v. Wissahickon Sch. Dist., 218 F. App'x 126, 131 (3d Cir. 2007).

Even assuming that the plaintiffs met this prima facie standard with respect to their claims against Keystone, it does not follow that the plaintiffs have also stated a claim for retaliation against the Commonwealth defendants. The second amended complaint says nothing about any allegedly retaliatory conduct on the part of any individual Commonwealth defendant, and we find that the retaliation claim against these individuals simply fails on the face of the pleading. There are no allegations in the second amended complaint that could conceivably be read to support the plaintiffs' argument that the Commonwealth defendants "aided and perpetuated" the allegedly retaliatory conduct by Keystone, or that the Commonwealth defendants

"failed to prevent those actions" or otherwise rendered "active assistance" to Keystone by promulgating a regulation that the plaintiffs casually suggests "endorses such actions." (Doc. 119, at 12.) Finally, the legal citations that the plaintiffs offer in support of their retaliation claim against the Commonwealth defendants do not, in fact, support these claims or the plaintiffs' theory regarding the Commonwealth defendants' alleged liability.

In sum, the plaintiffs' discrimination and retaliation claims brought against the Commonwealth defendants under the ADA and Section 504 lack plausible factual allegations to support them, and should be dismissed.

### C.     Plaintiffs' Due Process Claims Fail

In Counts III and IV of the second amended complaint, the plaintiffs assert that the Commonwealth defendants violated their right to procedural due process by failing to intervene in Keystone's efforts to terminate its relationship with the Rovners and end providing services to Miriam, and by failing to provide Miriam with a hearing in connection with this action by Keystone. The plaintiffs allege that these actions violate the Fourteenth Amendment to the United States Constitution (Count III0 and Title XIX of the Social Security Act (Count IV). These claims against the Commonwealth defendants fail for several reasons.

## 1. Eleventh Amendment Immunity

As a threshold matter, any claims brought under 42 U.S.C. § 1983 for alleged due process violations against the Commonwealth of Pennsylvania, its agencies, or officials sued in their official capacities fail as a matter of law. The Supreme Court and the Third Circuit Court of Appeals have long instructed that state officials may not be sued in their officials capacities in federal court under 42 U.S.C. § 1983, as such suits are in effect suits against the state itself, which enjoys sovereign immunity. See Kentucky v. Graham, 473 U.S. 159, 165-66 (1985); Edelman v. Jordan, 415 U.S. 651, 663 (1974); Laskaris v. Thornburgh, 661 F.2d 23, 26 (3d Cir. 1981). Moreover, a suit against a state official in that person's official capacity is, in effect, a suit against the official's office. Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989). Viewed in such a way, the Supreme Court has held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." Id. Accordingly, the plaintiffs' claims against the Commonwealth and the individual Commonwealth defendants in their official capacities should be dismissed as barred by the Eleventh Amendment, and because these defendants may not be sued under § 1983 in their official capacities.

## 2.     Lack of Personal Involvement

Secondly, constitutional tort liability under 42 U.S.C. § 1983 is personal in nature and can only follow personal involvement in the alleged wrongful conduct shown through specific allegations of personal direction or of actual knowledge and acquiescence in the challenged practice.  Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997); see also Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) ("A[n individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of *respondeat superior*.  Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988)).

As the Supreme Court has observed:

> Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*. . . . See Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (finding no vicarious liability for a municipal "person" under 42 U.S.C. § 1983); see also Dunlop v. Munroe, 7 Cranch 242, 269, 3 L.Ed. 329 (1812) (a federal official's liability "will only result from his own neglect in not properly superintending the discharge" of his subordinates' duties); Robertson v. Sichel, 127 U.S. 507, 515-516, 8 S.Ct. 1286, 3 L.Ed. 203 (1888) ("A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties").  Because vicarious

liability is inapplicable to <u>Bivens</u> and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.

<u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 676 (2009). Applying these benchmarks, courts have frequently held that, in the absence of evidence of supervisory knowledge and approval of subordinates' actions, a plaintiff may not maintain an action against supervisors based upon the misdeeds of their subordinates. <u>O'Connell v. Sobina</u>, No. 06-238, 2008 WL 144199, * 21 (W.D. Pa. Jan. 11, 2008); <u>Neuburger v. Thompson</u>, 305 F. Supp. 2d 521, 535 (W. D. Pa. 2004). Under any theory of liability under § 1983, however, a plaintiff must allege facts to show the personal involvement of each defendant in the alleged constitutional violation. <u>See</u> <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1207-08 (3d Cir. 1988).

In this case, the allegations in the second amended complaint are inadequate to demonstrate that the individual Commonwealth defendants were personally involved in the alleged misconduct summarized in the second amended complaint. Although the plaintiffs attempt to prop up their claims against these individuals by asserting that these state officials had knowledge of or involvement in the promulgation of regulations that the plaintiffs contend "endorsed the ability of providers to discharge home and community based waiver recipients at will," we find

that this argument fails to articulate personal involvement in the actual wrongdoing alleged in this case.

Moreover, the argument is also an overly general effort to impose individual liability on state actors for the discrete conduct of third parties, based upon the state officials' asserted knowledge of or involvement in the promulgation of state regulations that may relate in some way to the challenged conduct of others. Contrary to the plaintiffs' assertions otherwise, the second amended complaint fails to articulate actionable personal involvement on the part of any of the individual Commonwealth defendants, and these claims against these parties should be dismissed.

**D.     Plaintiffs Do Not Have an Independent Private Right of Action for Alleged Violations of 55 Pa. Code §§ 6400 et seq.**

In Count V, the plaintiffs claim that the Commonwealth defendants have violated Miriam Rovner's rights "secured by 55 Pa. Code §§ 6400, et seq., including Section 6400.16, 6400.32, 6400.33 and 6400.34 . . . ." (Second Am. Compl., Count V.) In this regard, the plaintiffs allege that the Commonwealth defendants deprived Miriam of rights or human dignity and otherwise caused her physical and emotional harm; denied her the right to receive scheduled and unscheduled visitors; and

prevented her from communicating, associating, and meeting privately with family and persons of Miriam's own choice.

The cited regulations are found in the chapter of Commonwealth's Public Welfare regulations governing Community Homes for Individuals with Mental Retardation. Notably, nothing in the regulations expressly provides for a private right of action under any of the regulations set forth in that chapter. Not surprisingly, our review of applicable case law in this field has turned up no case in which a provider was held liable to a private individual under the regulations at issue here.

In responding to the motion to dismiss, the plaintiffs do not specifically address this argument, or support their position that they are entitled to bring a cause of action for asserted violations of these regulatory provisions. Instead, the plaintiffs argue that "[i]n the seminal case under the MH/MR Act, In re Schmidt, 494 Pa. 86, 98 (1981), the Supreme Court of Pennsylvania held that the Act 'requires the state to provide adequate mental retardation services for persons in need of them. Joseph Schmidt has clearly demonstrated his need and the State must respond to it.'" (Doc. 119, at 23.) It is not clear what significance the plaintiffs believe this decision has with respect to their claims brought for alleged violations of the regulations cited in the second amended complaint, and we do not find that the cited authority holds that the plaintiffs enjoy a private right of action to enforce the terms of these regulations.

Moreover, even if the plaintiffs could maintain a private right of action under these regulations, the second amended complaint does not contain allegations to support the claim that any of the Commonwealth defendants violated any provision of the regulations cited. Thus, there are no allegations that can reasonably be read as claiming that any Commonwealth defendant abused Miriam Rovner in contravention of 55 Pa. Code § 6400.16. Likewise, the complaint in this case does not explain how any of these defendants violated 55 Pa. Code § 6400.32, which succinctly provides only that "[a]n individual may not be deprived of rights," or indicate how the Commonwealth defendants interfered with Miriam Rovner's right to receive scheduled and unscheduled visitors or communicate with family and persons of her own choice, which is identified in 55 Pa. Code § 6400.33. Similarly, the complaint does not contain any explanation as to how the Commonwealth defendants transgressed 55 Pa. Code § 6400.34, which addresses civil rights of qualified individuals that are protected, including nondiscrimination in the provision of services, physical accessibility, the opportunity to file lawsuits and complaints, and the right to be informed of the opportunity to register civil rights complaints.

Because we have found no legal authority supporting the plaintiff's view that they may maintain a private right of action for asserted violations of the foregoing regulations, and because the second amended complaint contains insufficient

allegations to connect the Commonwealth defendants to these vaguely pled claims, we will recommend that the claims set forth in Count V of the second amended complaint be dismissed as to the Commonwealth defendants.

### E.  The Defendants Are Entitled to Qualified Immunity

The paucity of legal support for the proposition that the Rovners can sue the Commonwealth defendants for failing to force Keystone to do something it was unwilling to do; namely, continue to provide services despite the increasingly acrimonious relationship with the Rovners, exposes another flaw in this case since the defendants are also entitled to qualified immunity from damages. In order to establish a civil rights claim the plaintiffs must show the deprivation of a right secured by the United States Constitution or the laws of the United States. Satisfying these elements alone, however, does not guarantee that the plaintiffs are entitled to recover damages from these public officials. Government officials performing "discretionary functions," are insulated from suit if their conduct did not violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999); see also Pearson v. Callahan, 555 U.S. 223 (2009). This doctrine, known as qualified immunity, provides officials performing discretionary functions not only defense to liability, but also

"immunity from suit."  Crouse v. S. Lebanon Twp., 668 F. Supp. 2d 664, 671 (M.D.

Pa. 2009) (Conner, J.) (citations omitted).  Qualified immunity:

> balances two important interests – the need to hold public officials
> accountable when they exercise power irresponsibly and the need to
> shield officials from harassment, distraction, and liability when they
> perform their duties reasonably.  The protection of qualified immunity
> applies regardless of whether the government official's error is "a
> mistake of law, a mistake of fact, or a mistake based on mixed questions
> of law and fact."

Pearson, 555 U.S. at 231.

Determinations regarding qualified immunity, and its application in a given

case, require a court to undertake two distinct inquiries.  First, the court must evaluate

whether the defendant violated a constitutional right.  Saucier v. Katz, 533 U.S. 194,

201-02 (2001), abrogated in part by Pearson, 555 U.S. 223; Curley v. Klem, 499 F.3d

199, 206 (3d Cir. 2007); Williams v. Bitner, 455 F.3d 186, 190 (3d Cir. 2006).  If the

defendant did not actually commit a constitutional violation, then the court must find

in the defendant's favor.  Saucier, 533 U.S. at 201.  If the defendant is found to have

committed a constitutional violation, the court must undertake a second, related

inquiry to assess whether the constitutional right in question was "clearly established"

at the time the defendant acted.  Pearson, 555 U.S. at 232; Saucier, 533 U.S. at 201-

02.  The Supreme Court has instructed that a right is clearly established for purposes

of qualified immunity if a reasonable state actor under the circumstances would understand that his conduct violates that right.  <u>Williams</u>, 455 F.3d at 191 (citing <u>Saucier</u>, 533 U.S. at 202).

In order to find that a right is clearly established, "the right allegedly violated must be defined at the appropriate level of specificity." <u>Wilson</u>, 526 U.S. at 615.  The Supreme Court has explained that, at least in some cases, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful."  <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002) (quoting <u>United States v. Lanier</u>, 520 U.S. 259, 271 (1997) (internal quotation marks and citation omitted)).  In some cases, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." <u>Wilson</u>, 455 F.3d at 191 (quoting <u>Hope</u>, 536 U.S. at 741).

The court is no longer required to conduct these two inquiries sequentially, <u>Pearson</u>, 555 U.S. at 239-40, and it may forego difficult constitutional issues and award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted. <u>Id.</u>  Where a court elects to address the alleged constitutional violations, however, the court's analysis of the merits for purposes of summary judgment merges with analysis of the

deprivation of federal rights for purposes of qualified immunity. Gruenke v. Seip, 225 F.3d 290, 299-300 (3d Cir. 2000); Crouse, 668 F. Supp. 2d at 671; see also Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record . . . to establish . . . a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).") Because qualified immunity entails a consideration of whether the law was clearly established at the time of a defendant's conduct, this defense, which focuses on the state of the law, presents a question of law for the court, and one which can often be resolved on summary judgment. See Montanez v. Thompson, 603 F.3d 243 (3d Cir. 2010). Moreover,

" 'The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established *statutory or constitutional* rights of which a reasonable person would have known.' Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (citation and internal quotations omitted)." Diana v. Oliphant, 441 F. App'x 76, 79 (3d Cir. 2011) cert. denied, 132 S. Ct. 1557, 182 L. Ed. 2d 166 (U.S. 2012)(emphasis added.). Therefore, this doctrine would apply to both federal statutory and constitutional claims. Id.

Here, we can find no right to compel an unwilling medical service provider to continue to provide services, much less a clearly established right to compel services from an unwilling provider. Quite the contrary, case law seems to consistently recognize the provider's right to choose whether to provide services. See, e.g., Miller v. Gorski Wladyslaw Estate, 547 F.3d 273, 281 (5th Cir. 2008) ("Even those health care providers that 'do choose to serve patients under Medicaid need not accept all such patients.'") (quoting Barney v. Holzer Clinic, Ltd., 110 F.3d 1207, 1212 (6th Cir. 1997) (citing 42 U.S.C. § 1396a(a)(23), 42 C.F.R. § 431.51(b)(1)); People First of Tennessee v. Clover Bottom Development Center, 753 F. Supp. 2d 701, 711 (M.D. Tenn. 2010) (citing 42 U.S.C. § 1396a(a)(23), 42 C.F.R. § 431.51(b)(1) ("The qualified provider must be willing to furnish services to the recipient."). Accordingly, we find that the defendants are entitled to qualified immunity in this case since nothing in case law could have alerted these officials that their actions violated "clearly established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999).[2]

---

[2]While the defendants have not separately argued qualified immunity in this motion, this Court is entitled to address this defense *sua sponte*, when appropriate. See Doe v. Delie, 257 F.3d 309 (3d Cir. 2001) (affirming *sua sponte* recommendation of qualified immunity by U.S. magistrate judge).

## V.   RECOMMENDATION

For the foregoing reasons, IT IS HEREBY RECOMMENDED THAT the Commonwealth defendants' motion to dismiss the second amended complaint (Doc. 96.) should be granted in its entirety, and that the case be marked closed.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof.  Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The briefing requirements set forth in Local Rule 72.2 shall apply.  A judge shall make a de novo determination of those portions of the report or specified  proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record.  The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 18th day of July 2013.

*S/Martin C.  Carlson*
Martin C. Carlson
United States Magistrate Judge

38